## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

RICHARD DAVIS *doing business as*
DAVIS ELECTRIC,

        **Plaintiff,**

v.

                                        Case No.  19-2531-DDC-KGG

OVERLAND CONTRACTING, INC.,

        **Defendant.**

## MEMORANDUM AND ORDER

This matter comes before the court on two motions:  (1) plaintiff Richard (John) Davis doing business as Davis Electric's Motion to Remand to Kansas State Court and for Attorney Fees (Doc. 7) and (2) defendant Overland Contracting, Inc.'s Motion to Dismiss (Doc. 5).

Plaintiff has moved to remand to state court, arguing that defendant's principal place of business is in Kansas for purposes of establishing diversity jurisdiction and removal was improper under the diversity statute.  Doc. 7.  Defendant has responded, opposing the motion and asserting that its principal place of business is in North Carolina.  Doc. 14.  Plaintiff did not file a reply, and the time to do so has expired.

In a separate motion, defendant has moved to dismiss plaintiff's breach of contract claim under Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiff's Petition fails to state a claim upon which relief can granted.  Docs. 5 & 6.  Plaintiff has responded, Doc. 8, and defendant has replied, Doc. 11.

These matters thus are fully briefed.  For reasons explained below, the court denies plaintiff's Motion to Remand and grants defendant's Motion to Dismiss.

## I.       Motion to Remand

The court first addresses plaintiff's motion for remand.  Plaintiff initially filed this breach of contract action in the Johnson County, Kansas District Court on August 20, 2019.  Doc. 1-1. On September 3, 2019, defendant removed the action to this court based on diversity jurisdiction. Doc. 1 at 1–2.  The remand dispute centers on where defendant's principal place of business is located for purposes of establishing its citizenship and thus whether defendant's removal from state court was proper.

### A.  Legal Standard

"Federal courts are courts of limited jurisdiction and, as such, must have a statutory basis to exercise jurisdiction." *Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002) (citation omitted).  "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974) (citation omitted); *see also* 28 U.S.C. § 1447(c) ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.").  Since federal courts are courts of limited jurisdiction, the party invoking federal jurisdiction bears the burden to prove it exists. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  And, "[w]hen challenged on allegations of jurisdictional facts, the parties must support their allegations by competent proof." *Hertz Corp. v. Friend*, 559 U.S. 77, 96–97 (2010) (citation omitted).  The burden of persuasion imposed on defendant, as the removing party here, requires it to establish that the court's exercise of diversity jurisdiction is appropriate by a preponderance of the evidence. *See McPhail v. Deere & Co.*, 529 F.3d 947, 954–55 (10th Cir. 2008) (explaining in a diversity jurisdiction dispute over the amount in controversy that "[t]he 'preponderance of the evidence

standard' applies to jurisdictional facts, not jurisdiction itself" because jurisdiction is a legal conclusion reached as a consequence of the jurisdictional facts and thus a removing party must satisfy this burden and "prove contested *facts*" establishing defendant is entitled to stay in federal court); *see also Middleton v. Stephenson*, 749 F.3d 1197, 1200 (10th Cir. 2014) (explaining the "party invoking diversity jurisdiction bears the burden of proving its existence by a preponderance of the evidence"); *Bellman v. NXP Semiconductors USA, Inc.*, 248 F. Supp. 3d 1081, 1108 (D.N.M. 2017) ("The defendant seeking removal must establish that federal court jurisdiction is proper by a preponderance of the evidence." (internal quotation marks and citations omitted)); *Stucky ex rel. Stucky v. Bates*, 2 F. Supp. 2d 1434, 1437 (D. Kan. 1998) ("The existence of diversity jurisdiction is usually determined from the complaint.  However, when the allegation of diversity is challenged, the party asserting jurisdiction has the burden of proving diversity by a preponderance of the evidence." (internal citations omitted)).

Defendant invokes the court's subject matter jurisdiction under the federal removal statute—28 U.S.C. § 1441—and the federal diversity statute—28 U.S.C. § 1332.  Section 1441(a) and (b) allows a defendant to remove an action originally filed in state court to federal court when diversity of citizenship under 28 U.S.C. § 1332(a) exists.  But, under 28 U.S.C. § 1441(b)(2), "[a] civil action otherwise removable solely on the basis of the jurisdiction under section 1332(a) of this title may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought."  So, removal is not permitted—even when complete diversity exists—if the plaintiff brought the state court action in a state where the defendant is a citizen.  *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996) ("When a plaintiff files in state court a civil action over which the federal district courts would have original jurisdiction based on diversity of citizenship, the defendant . . . may remove

the action to federal court . . . provided that no defendant is a citizen of the State in which such action is brought . . . ." (citing 28 U.S.C. § 1441(a), (b)) (internal quotation marks omitted)); *see also Brazell v. Waite*, 525 F. App'x 878, 884 (10th Cir. 2013) (explaining the forum-defendant rule prohibits removal based on diversity jurisdiction when the action is brought in the state where defendant is a citizen, but this rule is not jurisdictional and can be waived).

Section 1332 confers original jurisdiction on federal district courts where the amount in controversy exceeds $75,000 and complete diversity of citizenship exists between all plaintiffs and all defendants. 28 U.S.C. § 1332(a)(1); *see also Radil v. Sanborn W. Camps, Inc.*, 384 F.3d 1220, 1225 (10th Cir. 2004). To establish diversity jurisdiction, the citizenship of a business entity is determined by its organizational structure. If the business is a corporation, its citizenship is both where it is incorporated and the state where its principal place of business is located. 28 U.S.C. § 1332(c)(1); *Newsome v. Gallacher*, 722 F.3d 1257, 1267 (10th Cir. 2013).

The Supreme Court has instructed courts to apply the "nerve center" test when determining the location of a corporation's principal place of business:

> We conclude that "principal place of business" is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities. . . . And in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Hertz Corp.*, 559 U.S. at 92–93.

Here, the parties do not dispute that plaintiff is a citizen of Missouri, defendant is incorporated in and a citizen of Delaware, and the amount in controversy exceeds $75,000. But the parties dispute the location of defendant's principal place of business. If defendant's principal place of business is in Kansas—as plaintiff contends—the forum-defendant rule in

§ 1441(b)(2) prohibits removal from state court and the case should return to state court.  But if defendant's principal place of business is North Carolina—as defendant contends—removal was proper and the case should remain in this court.  The court thus considers below, under the preponderance of the evidence standard, whether defendant plausibly has established its principal place of business is in North Carolina.

### B.  Analysis

Defendant's notice of removal asserts that plaintiff is a citizen of Missouri and defendant is a Delaware corporation with its principal place of business in North Carolina.  Doc. 1 at 2. Defendant provides its Corporation Annual Report filed with the Kansas Secretary of State, and it lists a "principal office" address in Garner, North Carolina.  Doc. 1-2 at 1.

Plaintiff's Petition likewise alleges that defendant is a Delaware corporation.  Doc. 1-1 at 5.  But, plaintiff argues that remand to the Johnson County, Kansas District Court is appropriate because defendant's principal place of business is located in Kansas, and thus defendant is a citizen of the state where plaintiff filed the state court action.  The Petition alleges that defendant has "a business address of 6800 W. 115th Street, Suite 2292, Overland Park, KS 66211."  *Id.* And, plaintiff relies on the same Kansas Corporation Annual Report provided by defendant, which shows an "official mailing address" for defendant in Kansas:  "Tax Dept, 11401 Lamar Avenue, Overland Park[,] KS 66211."  Doc. 1-2 at 1; Doc. 7-1 at 1.  The report also lists six officers and one director and identifies each one's address as "11401 Lamar [Ave.], Overland Park, KS 66211."  *Id.*  Next, plaintiff provides a North Carolina Annual Report, which lists defendant's "mailing" address as the 11401 Lamar Avenue, Overland Park, KS address.  Doc. 7-2 at 1.  And, this report lists four officers with the same address in Kansas.  *Id.* at 1–2.  But this report also lists "reg office," "reg mailing," and "principal office" addresses in North Carolina.

*Id.* at 1.  Finally, plaintiff provides two documents filed with the California Secretary of State. The first is a 1997 "Statement and Designation by a Foreign Corporation."  This document shows defendant doing business in California as "KS OVERLAND CONTRACTING INC." Doc. 7-3 at 1.  It also lists defendant's "principal executive office address" as the 11401 Lamar Avenue, Overland Park, Kansas address.  A more recent "Statement of Information" filed in 2019 still lists the corporation name as "OVERLAND CONTRACTING INC. WHICH WILL DO BUSINESS IN CALIFORNIA AS KS OVERLAND CONTRACTING INC."  Doc. 7-4 at 1. But, this 2019 document lists the "principal executive office" as the Garner, North Carolina address.  However, the "mailing address" listed is the 11401 Lamar Avenue, Overland Park, Kansas address.  And, again, three corporate officers and one director are reported as having their address at this Overland Park, Kansas address.

Plaintiff argues that even though defendant reports its "principal place of business" as the Garner, North Carolina address on certain annual corporate filings, the nerve center test identifies defendant's principal place of business as in Kansas.  This is so, plaintiff contends, because defendant has listed the mailing address and addresses for the officers and directors as places in Kansas and thus Kansas is the place where the defendant's "officers direct, control and coordinate the corporation's activities."  *Hertz Corp.*, 559 U.S. at 92–93.  And, plaintiff asserts, a presumption against federal jurisdiction exists, and the court should resolve any doubts in favor of remand.  Doc. 7 at 5 (citing *Coca-Cola Bottling of Emporia, Inc. v. S. Beach Beverage Co., Inc.*, 198 F. Supp. 2d 1280, 1283 (D. Kan. 2002)).[1]

---

[1]  Indeed, as courts of limited jurisdiction, district courts in the Tenth Circuit traditionally have applied a presumption against jurisdiction when an action is removed from state court and diversity jurisdiction is uncertain.  *See, e.g.*, *City of Neodesha v. BP Corp. N. Am. Inc.*, 176 F. Supp. 3d 1233, 1237 (D. Kan. 2016) ("[F]ederal courts strictly construe removal statutes and resolve all doubts in favor of remand."); *Owens v. Dart Cherokee Basin Operating Co.*, No. 12-4157-JAR-JPO, 2015 WL 7853939, at *2 (D. Kan. Dec. 3, 2015) ("Because federal courts are courts of limited jurisdiction, there is typically a

Defendant, on the other hand, maintains that its principal place of business is North Carolina. In support, defendant similarly relies on the various corporate filings provided by plaintiff, which include references to its principal office in North Carolina. Defendant argues that merely listing a mailing address for the corporation and its officers and a director "is not sufficient to establish the corporation's citizenship there." Doc. 14 at 3. Defendant also provides an Affidavit from its President. Doc. 14-1. In it, President Sean Terrell testifies that defendant's headquarters is located at 600 N. Greenfield Parkway, Garner, North Carolina 27529. *Id.* at 1. And, his office and the Vice President's office are both located at this North Carolina address. *Id.* Mr. Terrell explains that "[a] majority of [his] activities as President of [defendant] relating

---

presumption against federal jurisdiction. However, there is no antiremoval presumption for cases arising under [the Class Action Fairness Act]." (internal citations and quotations omitted)); *Gabbert v. Wells Fargo Home Mortg.*, No. 1:15-CV-16 TS, 2015 WL 3685331, at *2 (D. Utah June 12, 2015) ("The Tenth Circuit has repeatedly affirmed the existence of a presumption against removal. The basis for this presumption is the belief that plaintiff's right to choose the forum outweighs the defendant's right to removal."); *Khalil v. Dwyer Grp., Inc.*, No. 11-cv-02511-JAR-DJW, 2011 WL 6140531, at *2 (D. Kan. Dec. 9, 2011) ("Where a plaintiff has not instituted suit in federal court, [t]here is a strong presumption that the plaintiff has not claimed a large amount in order to confer jurisdiction on a federal court . . . . If any uncertainties exist regarding the satisfaction of the jurisdictional amount, the [c]ourt must resolve the uncertainties in favor of remand." (internal citations and quotations omitted)); *Havens Protected "C" Clamps, Inc. v. Pilkington PLC*, No. 00-2035-JWL, 2000 WL 382027, at *3 (D. Kan. Mar. 28, 2000) ("It is well-settled in the Tenth Circuit that there is a presumption against removal jurisdiction. As a result, any doubts must be resolved in favor of remand." (internal quotations and citations omitted)).

When considering the amount in controversy requirement in a notice of removal from state court to our court in a Class Action Fairness Act ("CAFA") case, the Supreme Court held there was no presumption against removal in CAFA cases, but declined to address the appropriateness of a presumption against removal jurisdiction in cases such as this one. *See Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014); *see also Speed v. JMA Energy Co.*, 872 F.3d 1122, 1128 (10th Cir. 2017) (explaining in a case decided after *Dart Cherokee* that no presumption against removal exists because it was a CAFA action and *Dart Cherokee* expressly found no presumption against removal in CAFA cases); *Bellman v. NXP Semiconductors USA, Inc.*, 248 F. Supp. 3d 1081, 1108 (D.N.M. 2017) (noting in a post-*Dart Cherokee* case that a presumption against removal exists, but explaining this presumption "should not . . . be interpreted as hostility toward removal cases in the federal courts"); *City of Neodesha*, 176 F. Supp. 3d at 1237 n.9 (discussing *Dart Cherokee* and noting that no Tenth Circuit cases "directly address the impact of *Dart Cherokee* on any presumption against removal jurisdiction" in non-CAFA cases, but noting that district courts in the Tenth Circuit "have continued to recite the presumption" after *Dart Cherokee* was decided). To decide the remand motion in this case, the court need not decide whether to apply a presumption against removal jurisdiction because it is not dispositive. As explained below, defendant plainly has satisfied its preponderance of the evidence burden.

to the direction, control, and coordination of [defendant's] activities occur outside of Kansas." *Id.* at 2.

Defendant's bylaws were amended, effective July 20, 2015, to use the Garner, North Carolina address as the corporation's principal place of business. *Id.* at 2. And, defendant's website identifies the headquarters as the Garner, North Carolina location. *Id.* Mr. Terrell also specifies how defendant leases its headquarters property in North Carolina, but neither owns nor leases any property in Kansas. *Id.* But, in its annual corporate filings, defendant lists the 11401 Lamar Avenue, Overland Park, Kansas address for mailings and as the address of its officers and a director because this is the world headquarters of defendant's parent company, Black & Veatch Corporation. *Id.* Though defendant uses the parent company's address for some purposes on these filings, Mr. Terrell states that defendant's work in Kansas last year "accounted for a very small, less than 5% portion of [defendant's] work or income," that defendant negotiates contracts "at a variety of locations around the country," and that defendant has contractor licenses and files state tax returns in several states, but not Kansas. *Id.* at 2–3.

After considering the evidence presented, the court concludes remand is not appropriate. "[I]n practice" the principal place of business "should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination . . . ." *Hertz Corp.*, 559 U.S. at 93. "[U]nder the nerve center test, a statement in an affidavit, assuming the affiant has personal knowledge, that a corporation has its corporate headquarters in a given State is sufficient, absent contrary evidence, to show by a preponderance of the evidence that the corporation's principal place of business is located in that State." *Thompson v. Intel Corp.*, No. CIV 12-0620 JB/LFG, 2012 WL 3860748, at *17 (D.N.M. Aug. 27, 2012). Here, the Affidavit from defendant's President explains

defendant's headquarters is in North Carolina, this headquarters address is used on its website and in its bylaws, and defendant's President and Vice President maintain their offices in this location.  Defendant performs work at various locations throughout the country, but Kansas does not account for a large portion of its work or income.  Plaintiff's only contrary evidence is that some of defendant's corporate filings use a Kansas address for mailing and for its officers and directors.  But, as Mr. Terrell explains, this is the address of its corporate parent, and defendant itself does not own or lease space in Kansas.  *See Armstrong v. Goldblatt Tool Co.*, 609 F. Supp. 736, 738 (D. Kan. 1985) (explaining a corporate subsidiary may have a different principal place of business than its corporate parent).  And, no evidence suggesting that the center of direction, control, and coordination of defendant's activities is some place other than North Carolina.

The Supreme Court has recognized that the nerve center test does not always draw a bright line and "some corporations may divide their command and coordinating functions among officers who work at several different locations."  *Hertz Corp.*, 559 U.S. at 95–96.  But, the Court explained, district courts should apply the standard "sensibl[y]" to determine "the center of overall direction, control, and coordination."  *Hertz Corp.*, 559 U.S. at 95–96.  Merely listing a Kansas or North Carolina address on a corporate form does not mean that a corporation's nerve center is located there.  *Id.* at 96–97 (explaining if the location is challenged "the mere filing of a form like the Securities and Exchange Commission's Form 10-K" listing a principal executive office is not sufficient proof and "the parties must support their allegations by competent proof").  But as described above, defendant here has provided more, supporting its allegation that the principal place of business is in North Carolina.  Defendant thus has satisfied its preponderance of the evidence burden.  *See Hernandez v. Chevron U.S.A., Inc.*, 347 F. Supp. 3d 921, 968 (D.N.M. 2018) (denying motion to remand by plaintiff—a Texas citizen—where defendant's

principal office registered with New Mexico Secretary of State was a Texas address but officers were listed at a Louisiana address and a director confirmed that the defendant directed and controlled its business from its corporate headquarters in Louisiana and no officers actually worked in Texas or New Mexico, and holding that defendant thus "has shown, by a preponderance of the evidence, jurisdictional facts, which demonstrate that its principal place of business is in Louisiana" and thus complete diversity existed); *Fotouhi v. Mobile RF Sols., Inc.*, No. 15-2587-JWL, 2015 WL 1427139, at *1–3 (D. Kan. Mar. 27, 2015) (holding affidavit of CEO explaining that the defendant currently was directed, controlled, and coordinated from Nebraska office and that the Kansas office was a shell office only used on occasion was sufficient to satisfy defendant's burden of establishing the principal place of business was in Nebraska, despite plaintiff's evidence showing the headquarters may have been in Kansas a couple of years before the lawsuit was filed); *CVR Energy, Inc. v. Wachtell, Lipton, Rosen & Katz*, No. 13-2547-JAR-TJJ, 2014 WL 4059761, at *6 n.46  (D. Kan. Aug. 14, 2014) (noting plaintiff's principal place of business appeared to be its headquarters location in Texas that was listed on its website and SEC filings, despite maintaining an office in Kansas where the CFO, General Counsel, and legal department were located); *Thompson*, 2012 WL 3860748, at *13–18 (denying motion to remand where plaintiff argued defendant's principal place of business was in New Mexico but defendant presented evidence from its website showing a corporate headquarters address in California and an affidavit stating the headquarters and principal place of business are in California, board meetings take place in California, and no corporate officers reside in New Mexico).

In sum, defendant has proved by a preponderance of the evidence that its principal place of business is in North Carolina—not Kansas—as required to invoke jurisdiction properly under

§ 1332 and § 1441.  The court thus denies plaintiff's Motion to Remand and exercises diversity jurisdiction over plaintiff's claim.

## II.   Motion to Dismiss

With subject matter jurisdiction established, the court next turns to defendant's argument that the court should dismiss plaintiff's breach of contract claim for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

### A.  Factual Background

The court takes the following facts from plaintiff's Petition (Doc. 1-1) and views them in the light most favorable to plaintiff.  *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (explaining that court must "accept as true all well-pleaded factual allegations in the complaint and view them in the light most favorable to the [plaintiff]" (citation and internal quotation marks omitted)).

Plaintiff provides electrical service installation and repair and related construction services.  Doc. 1-1 at 5 (Pet. ¶ 2).  Defendant is a general contractor who provides construction services for commercial projects in multiple states.  *Id.* (Pet. ¶ 4).  Plaintiff and defendant entered into a Subcontract for Construction Services (the "December Subcontract") dated December 13, 2018.  *Id.* (Pet. ¶¶ 5–6).  Under the December Subcontract, defendant could elect to subcontract certain services under defendant's contract with Tesla Motors, Inc. to plaintiff.  *Id.* at 5–6 (Pet. ¶¶ 7–8).  Defendant could make this election by issuing a purchase order to plaintiff for the particular project it was subcontracting.  *Id.* at 6 (Pet. ¶ 8).  It would notify plaintiff either via email or a web-based application called "iSupplier Portal" when a purchase order was issued to plaintiff.  *Id.* (Pet. ¶ 10).

From November 2018 through January 2019,[2] defendant awarded four projects to plaintiff.  Doc. 1-1 at 6 (Pet. ¶¶ 11-18).  Plaintiff was notified about three of these projects through purchase orders (the "Purchase Order Projects") and about the fourth via email (the "Grand Hotel Tesla Project").  *Id.*  The gross value of these projects exceeded $490,000 and plaintiff's net profit would have exceeded $182,000.  *Id.* at 6–7 (Pet. ¶¶ 20–21).  "Plaintiff took immediate action to perform these projects as set forth under the terms of" the December Subcontract.  *Id.* at 7 (Pet. ¶ 21).  But on May 20, 2019, plaintiff noticed in the iSupplier Portal that defendant had cancelled all purchase orders issued to him.  *Id.* (Pet. ¶ 22).

When plaintiff contacted defendant about the cancellations, defendant's employee in procurement operations informed him that cancellation notices had been sent for the three Purchase Order Projects and claimed that defendant never had awarded the Grand Hotel Tesla Project to plaintiff.  Doc. 1-1 at 7 (Pet. ¶¶ 23–24).  The employee attached the cancellation notices that were sent in March and April 2019[3] to her email, but they were addressed to the

---

[2] Plaintiff's Petition refers to a purchase order dated January 7, 2018.  Doc. 1-1 at 6.  But, the purchase order is attached to the Petition and dated January 7, 2019.  *Id.* at 35.  The 2019 date makes more sense with the chronology of other events and matches the purchase order, so the court uses it here.

 And, while not explained in plaintiff's Petition or the attachments to it, it appears the two purchase orders issued before the date of the December Subcontract—December 13, 2018—may have been issued under a different October 15, 2018 Subcontract for Construction Services (the "October Subcontract"), which plaintiff attaches to his Response.  Doc. 8-1 (subcontract referring to the Electrify America prime contract, rather than the Tesla Motors prime contract); *see also* Doc. 1-1 at 28–31 (November 2018 purchase orders attached to plaintiff's Petition referring to Electrify America projects).  The December Subcontract and October Subcontract contain similar terms.  Though the October Subcontract was not attached to the Petition, the court notes in footnotes below where the terms of the two subcontracts are the same or differ for purposes of its analysis.

[3] Again, the Petition indicates these notices were sent in 2018.  Doc. 1-1 at 7.  But, the initial purchase orders were not issued until later in 2018 or early in 2019 and the documents attached to the Petition have the purchase order revisions dated 2019.  Doc. 1-1 at 37–42.  Because the exhibits provided list 2019 dates and 2019 dates conform with the larger chronology alleged by the Petition, the court uses 2019 here.

attention of Matt Williams. *Id.* (Pet. ¶¶ 25–26).[4]  Plaintiff never had employed a person named Matt Williams. *Id.* (Pet. ¶ 26).  And, defendant gave no reason for its cancellations. *Id.* (Pet. ¶¶ 27, 31).

To terminate the December Subcontract, defendant was required to provide plaintiff notice of termination in writing.  Doc. 1-1 at 6 (Pet. ¶ 9).  Plaintiff contends defendant's termination of the projects awarded to plaintiff without notice is a breach of the parties' agreement. *Id.* at 7 (Pet. ¶ 33).  And, this breach has damaged plaintiff "in an amount not less than $182,000.00." *Id.*  (Pet. ¶ 34).  Plaintiff attached the December Subcontract, the purchase orders, and the cancellations to his Petition. *See* Doc. 1-1 at 9–42.

### B. Legal Standard

Under Rule 12(b)(6), a defendant may move to dismiss for failing to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Federal Rule of Civil Procedure 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "'will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must assume that the factual allegations in the complaint are true. *Id.*  But this requirement does not extend to every assertion made in a complaint.  The court is "'not bound to

---

[4]     The initial purchase orders also are addressed to the attention of Matt Williams. Doc. 1-1 at 28–32, 35–36. But, the supplier on each purchase order and purchase order revision notice is listed as "Davis Electric." *Id.* at 28–32, 35–42.

accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Ashcroft*, 556 U.S. at 678). Also, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)). Essentially, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). This plausibility standard reflects the requirement in Federal Rule of Civil Procedure 8 that pleadings must provide defendants with fair notice of the nature of the claims as well as the grounds upon which each claim rests. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191–92 (10th Cir. 2012).

When evaluating a motion to dismiss under Rule 12(b)(6), the court may consider "not only the complaint itself, but also attached exhibits and documents incorporated into the complaint by reference." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citations omitted). Also, a court "'may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.'" *Id.* (quoting *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007)).

## C. Analysis

To allege a breach of contract claim under Missouri law,[5] plaintiff must allege the following elements: "'(1) the existence and terms of a contract; (2) that plaintiff performed or tendered performance pursuant to the contract; (3) breach of the contract by the defendant; and (4) damages suffered by the plaintiff.'" *Aspen Square, Inc. v. Am. Auto. Ins. Co.*, No. 2:18-CV-02255-JAR-JPO, 2019 WL 1115261, at *9 (D. Kan. Mar. 11, 2019) (quoting *Keveney v. Mo. Military Acad.*, 304 S.W.3d 98, 104 (Mo. 2010) (further citation omitted)); *see also Chavis Van & Storage of Myrtle Beach, Inc. v. United Van Lines, LLC*, 784 F.3d 1183, 1188 (8th Cir. 2015) (applying Missouri law). "The essential elements of a valid contract include [an] offer,

---

[5]     Because this is a diversity case, the court "appl[ies] the substantive law of the forum state, including its choice of law rules." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005) (citations omitted). Here, Kansas is the forum state and defendant's briefing relies on Kansas law. Plaintiff's Response does not cite Kansas or Missouri law, arguing only about the contractual language itself and the facts alleged in his Petition.

In Kansas, courts generally apply the law chosen by the parties to control their agreement unless doing so would contravene public policy. *Brenner v. Oppenheimer & Co., Inc.*, 44 P.3d 364, 375 (Kan. 2002). The parties agreed in Section 15.2 of the General Terms and Conditions of the December Subcontract (and Section 15.2 of the October Subcontract) that Missouri law governs their "Agreement[(s)]." Doc. 1-1 at 19; Doc. 8-1 at 13. The court thus applies Missouri law because the parties have chosen Missouri law to govern their contractual relationship. *See Burlington N. & Santa Fe Ry. Co. v. Kan. City S. Ry. Co.*, 45 F. Supp. 2d 847, 851 (D. Kan. 1999) (explaining Kansas courts generally give effect to choice of law provisions and applying Missouri law where parties' agreement contained an express choice of law provision).

acceptance, and bargained for consideration." *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. 1988).[6]

Defendant contends that the "facts alleged in [p]laintiff's Petition and the incorporated exhibits show that [p]laintiff's claims are barred by the terms of the contracts at issue." Doc. 5 at 1. Defendant argues that "three essential elements of a breach of contract claim" are missing: "(1) the existence of a contract; (2) that [d]efendant breached the terms of a contract, and (3) that [p]laintiff sustained compensable damages." *Id.* The court addresses each of these arguments, in turn, below.

### i. Existence of Contract (Grand Hotel Tesla Project)

*First*, defendant argues that plaintiff has not pleaded the existence of a contract for the Grand Hotel Tesla Project. This is so, defendant contends, because the December Subcontract "does not obligate Defendant to use any of the Plaintiff's services on any project." Doc. 5 at 2. Instead, defendant asserts that it could elect to use plaintiff by issuing a purchase order. *Id.* And, even then, defendant argues that the terms of the purchase order provide "the subcontractor is still not authorized to proceed with any work unless and until Defendant issues a Notice to Proceed." *Id.* Any costs incurred by a subcontractor before it receives a Notice to Proceed are at the subcontractor's own risk expense. *Id.* at 2–3. Defendant argues that no contract existed for the Grand Hotel Tesla Project—plaintiff alleges it was awarded via email—because no purchase order issued for that project, as required by the December Subcontract. *Id.* at 3.

---

[6]     The choice of substantive law isn't a consequential decision here because the elements for breach of contract under Kansas law are virtually the same:  "(1) the existence of a contract between the parties; (2) sufficient consideration to support the contract; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of contract; and (5) damages to the plaintiff caused by the breach." *Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013); *see also McKenzie v. Cibis*, No. 12-2394-EFM, 2012 WL 5869875, at *4 (D. Kan. Nov. 19, 2012).

Plaintiff argues generally that a contract exists once defendant has issued a purchase order regardless of whether it has provided a Notice to Proceed. *See* Doc. 8 at 4. But, plaintiff's Response never refutes the assertion that no purchase order issued for the Grand Hotel Tesla Project. Indeed, plaintiff states: "Plaintiff understands that Defendant had to issue a purchase order in order for there to be a contractual obligation." *Id.* And, plaintiff asserts that the combination of the purchase orders and December Subcontract "contain all essential terms" to establish a contractual obligation. Doc. 8 at 4; *see also Reitz v. Nationstar Mortg., LLC*, 954 F. Supp. 2d 870, 887 (E.D. Mo. 2013) (explaining "no contract exists where the essential terms of the purported contract are reserved for future determination").

Crucial here, plaintiff never alleges that defendant issued a purchase order for the Grand Hotel Tesla Project. Plaintiff contends that he was awarded the Grand Hotel Tesla Project via email. Doc. 1-1 at 6 (Pet. ¶ 15) ("Davis Electric was notified by email . . . that it had been awarded the Grand Hotel Tesla project in Tusayan, Arizona. A copy of the email communication is attached hereto and incorporated herein . . . ."). The email correspondence attached to his Petition discusses plaintiff as the contractor for the Grand Hotel Tesla Project, but does not contain any terms about the parties' agreement for that project. *See* Doc. 1-1 at 32–34.

As defendant identified, the December Subcontract provides that defendant "*may elect* to utilize Subcontractor to perform portions of [construction services] . . . pursuant to individual Purchase Orders . . . issued by [defendant]." Doc. 1-1 at 9 (emphasis added). The purchase order must provide details about the work to be performed and, when issued by defendant, is "deemed accepted by the Subcontractor and binding on the Parties hereunder."[7] *Id.* at 11 (§ 1.1).

---

[7] The December Subcontract provides that the subcontractor could send a rejection notice to defendant "within 24 hours of Subcontractor's receipt of the subject" purchase order. Doc. 1-1 at 11 (§ 1.1). Though not pertinent to the arguments about the Grand Hotel Tesla Project—which appears to fall under the scope of the December Subcontract—the October Subcontract's terms differ. The October

Any work performed by Subcontractor before receiving a purchase order is "at Subcontractor's own risk, and [defendant] shall not be obligated to compensate Subcontractor for such work." *Id.*

Because plaintiff never alleges the existence of a purchase order establishing the essential terms of the parties' purported agreement for the Grand Hotel Tesla Project, plaintiff has failed to allege the first element of a breach of contract claim—the existence and terms of a contract. As plaintiff admits, defendant needed to "issue a purchase order in order for there to be a contractual obligation" arising from the December Subcontract.  Doc. 8 at 4.  And yet, he never alleges such a purchase order.  The court thus grants defendant's motion to dismiss plaintiff's breach of contract claim asserting defendant failed to notify plaintiff of the cancellation of the Grand Hotel Tesla Project because plaintiff has failed to establish the existence of a contract for that project.

### ii.  Breach of Contract Terms

*Next*, defendant argues that plaintiff has failed to plead a plausible breach of the contract terms for any of the four projects.  Defendant first argues that because plaintiff failed to plead that defendant issued a purchase order for the Grand Hotel Tesla Project, the parties never formed a contract and thus defendant's "failure to use Plaintiff's services on that Project" could not "possibly give rise to a breach of the terms of the Subcontract."  Doc. 5 at 3.  As already explained, plaintiff has not stated a plausible breach of contract claim for the Grand Hotel Tesla Project.  For the Purchase Order Projects—the three projects defendant issued purchase orders to plaintiff for that were visible in the iSupplier Portal—defendant contends that plaintiff has

---

Subcontract similarly provides that an issued purchase order "will be deemed accepted by Subcontractor and binding on the Parties hereunder," but explicitly states that, if subcontractor rejects a purchase order, it is considered a material breach of the agreement.  Doc. 8-1 at 3 (§ 1.1).

alleged no plausible breach of contract claim because the December Subcontract allows defendant to cancel or terminate previously issued purchase orders at any time by giving written notice to plaintiff.  *Id.*  Defendant argues that plaintiff has pleaded facts establishing he received written notice of termination through the iSupplier Portal and emails with defendant's employee in procurement operations, and thus plaintiff's allegations show that defendant gave plaintiff the contractually required notice.  *Id.*  In other words, plaintiff's allegations by themselves establish that defendant didn't breach the contracts terms.

Plaintiff "agrees that Defendant had a contractual right to terminate the Purchase Orders issued at any time by giving written notice to Plaintiff."  Doc. 8 at 5.  But, plaintiff argues, defendant never provided the written notice required by the terms of the December Subcontract. *Id.*  Plaintiff contends that defendant instead sent cancellation notices to someone named Matt Williams—who plaintiff did not employ and never has employed.  *Id.*  And, to the extent defendant claims plaintiff received notice by logging into the iSupplier Portal or corresponding with its procurement operations employee, plaintiff argues, "[t]his was merely confirmation of Defendant's breach [and] not the written notice provided for in the Subcontract."  *Id.*

Accepting the factual allegations in the Petition as true and viewing them in the light most favorable to plaintiff, the court concludes plaintiff has alleged a plausible breach by defendant for failing to provide written notice of cancellation for the three Purchase Order Projects in the manner provided for by the terms of the December Subcontract.  Under the December Subcontract, defendant "may terminate any [purchase order], this Agreement, or any portion of the Work, at any time, at its discretion, regardless of whether any event has occurred which constitutes a default by Subcontractor hereunder, by giving Subcontractor written notice

specifying the date of termination."  Doc. 1-1 at 18–19 (§ 11.4).[8]  Notices required under the

December Subcontract must "be in writing and either delivered personally or sent by facsimile,

overnight delivery, express mail, or certified or registered mail, postage prepaid, return receipt

requested, *to the Subcontractor at the address first written above* . . . ."  *Id.* at 20 (§ 15.5)

(emphasis added).  The address provided for plaintiff on the first page of the December

Subcontract is "6842 NE 312th Street, Turney, MO 64493."[9]  *Id.* at 9.  Notices may also be sent

to "such other addresses as may be provided by amendment hereto."  *Id.*

        Defendant argues the cancellation notices list plaintiff's address identified in the

December Subcontract, and both the original purchase orders and cancellation notices were

directed to the attention of Matt Williams, so "[n]otice was sent and received to the person

identified in each contract Purchase Order at issue."  Doc. 6 at 7.  And, defendant contends, the

"termination provisions of" the December Subcontract only require written notice and do "not

specify the method of delivery," so posting the notice on the iSupplier Portal or including them

in an email satisfied the written notice requirement.  *Id.* at 8.

---

[8]        Though not properly before the court on this Motion to Dismiss because it was not attached to the
Petition, it appears two of the purchase orders may rely on the October Subcontract that plaintiff attached
to his Response.  The October Subcontract contains an identical termination provision.  Doc. 8-1 at 12 (§
11.4).

[9]        The October Subcontract's notice instructions differ slightly from the December Subcontract.
The October Subcontract provides notices must "be in writing and either delivered personally or sent by
*email*, facsimile, overnight delivery, express mail, or certified or registered mail, postage prepaid, return
receipt requested, to the Subcontractor at the address first written above . . . ."  Doc. 8-1 at 13 (§ 15.5)
(emphasis added).  Like the December Subcontract, notices may also be sent to "such other addresses as
may be provided by amendment hereto."  *Id.*  The address provided for plaintiff in the October
Subcontract is the same as in the December Subcontract.  *Id.* at 1.  And, no email address for plaintiff is
provided in the October Subcontract.  Plaintiff didn't attach the October Subcontract to his Petition.  So,
the court does not consider the October Subcontract in its analysis of the Motion to Dismiss.  But, the
court notes that plaintiff's allegations plausibly assert that the notice was not provided as required by the
October Subcontract.

But, defendant's arguments that plaintiff's pleaded facts show defendant "fully complied with all of its contractual obligations" and thus fail to state a plausible claim are unpersuasive. Reading § 11.4 and § 15.5 together, plaintiff plausibly has alleged that the contract required delivery of written notice to terminate a purchase order either personally or mailed to plaintiff's specified address, which, plaintiff alleges, did not occur. *See World Enters., Inc. v. Midcoast Aviation Servs., Inc.*, 713 S.W.2d 606, 609 (Mo. Ct. App. 1986) (explaining "[c]ontracts must be read as a whole"). Plaintiff alleges that "while viewing the iSupplier Portal, Plaintiff noted that all P.O.s issued to Plaintiff had been cancelled." Doc. 1-1 at 7 (Pet. ¶ 22). And, when he contacted defendant's procurement operation's employee, she "emailed back notifying Davis Electric that the Purchase Orders had been" cancelled and attached copies of the "cancellation notices [that] had been sent." *Id.* (Pet. ¶¶ 24, 25). But, plaintiff alleges that these notices were "sent to the attention of 'Matt Williams' a person [who] is not and has never been employed by Davis Electric." *Id.* (Pet. ¶ 26). And, plaintiff alleges defendant's "termination of Plaintiff without notice is a breach of the parties' agreement." *Id.* (Pet. ¶ 34). Viewing these facts and drawing all reasonable inferences in plaintiff's favor, plaintiff plausibly has alleged that defendant failed to provide the written notice required by the terms of the December Subcontract when it terminated the Purchase Order Projects.

In sum, plaintiff plausibly alleges that defendant did not give the required written notice, delivered personally or sent by facsimile or mail, to the address he specified in the December Subcontract. Instead, plaintiff discovered the cancellations by other means, rather than through the notice procedures defendant had agreed in the contract to provide. The court thus declines to dismiss plaintiff's breach of contract claim based on defendant's second argument for dismissal at this stage of the proceedings.

### iii.  Damages

*Finally,* defendant argues that plaintiff has "failed to allege facts establishing a compensable claim for damages."  Doc. 5 at 3.  Defendant asserts that plaintiff has not pleaded any other "costs, expenses, or other damages other than lost profits" in his Petition.  Doc. 6 at 9.  And, defendant contends, the December Subcontract expressly bars recovering damages for lost profits, so plaintiff has failed to state a plausible claim for relief.  Doc. 5 at 3–4.

Plaintiff's Petition alleges that "Plaintiff took immediate action to perform these projects as set forth under the terms of the parties' subcontract."  Doc. 1-1 at 7 (Pet. ¶ 21).[10]  But, on May 20, 2019, he noticed in the iSupplier Portal that defendant had cancelled the purchase orders.  *Id.* (Pet. ¶ 22).  And, he believes that defendant issued purchase orders for the projects "to other subcontractors as the projects are being built and appear to be nearing completion."  *Id.* (Pet. ¶ 32).  Plaintiff alleges his "net profit in these four projects would have totaled in excess of $182,000.00," and that "[a]s a direct and consequential result of Defendant's breach, Plaintiff has been damaged in an amount not less than $182,000.00."  *Id.* (Pet. ¶¶ 20, 34).

Article 8 of the General Terms and Conditions, as incorporated into the December Subcontract, limits defendant's liability.  It provides that defendant

> shall not be liable (in contract or in tort, including negligence) to Subcontractor
> . . . *for loss of profits or revenue*, loss of use, loss of opportunity, loss of goodwill,

---

[10]     It is unclear what plaintiff did to perform these projects.  Other allegations indicate plaintiff had not yet completed (or perhaps started) the projects.  *See* Doc. 1-1 at 7 (Pet. ¶ 29) (where plaintiff asserts he "notified Defendant" that he remained "'capable, ready, and willing to complete these projects'" after discovering the purchase order cancellations).  Defendant also contends plaintiff was not yet authorized to start work on any projects, so the contract terms bar recovering any damages—lost profits or otherwise—for this reason as well.  Doc. 11 at 5 n.1.

On a motion to dismiss, the court considers only the allegations in the Petition and attachments, and the court cannot determine from these documents alone the status of the projects.  And, at this stage, the court views the facts in the light most favorable plaintiff.  Still, as explained in this subsection, plaintiff's damage claim for lost profits seeks the profit he would have earned had defendant not cancelled the contracts, rather than amounts owed for work performed.

> cost of capital, or any punitive, special, incidental, indirect, or consequential damages including, without limitation, governmental or regulatory sanctions for such damages resulting from [defendant's] . . . performance, nonperformance, or delay in performance of their obligations, or from [defendant's] delay, termination (with or without cause) or suspension of the Work.  [Defendant's] liability for direct damages in any circumstances shall not exceed the [purchase order] Price for the Work.

Doc. 1-1 at 17 (emphasis added).[11]  Similarly, Section 11.4 provides that if defendant exercises its discretion and terminates a purchase order or the December Subcontract:

> [Defendant] shall pay Subcontractor in full discharge of all obligations here under [sic] and the terminated [purchase orders] for such portion of the Work as Subcontractor . . . shall have actually completed to [defendant's] reasonable satisfaction and the Client's acceptance.  [Defendant] *shall not be obligated to pay Subcontractor for any anticipated profit on any portion of the Work not completed*, nor shall Subcontractor be entitled to special, indirect, incidental, or consequential damages.

*Id.* at 18–19 (emphasis added).[12]

Plaintiff focuses his arguments on the final sentence of Article 8:  "[Defendant's] liability for *direct damages* in any circumstances shall not exceed the [purchase order] Price for the Work."  Doc. 1-1 at 17 (emphasis added).  Plaintiff contends this sentence entitles him to recover direct lost profits damages, despite the other Article 8 language, quoted above, that limits defendant's liability and expressly prohibits loss of profits damages.  Doc. 8 at 6 (arguing defendant's breach is the "direct source of the damage" and that the damages sought "may be awarded" under this sentence of the contract despite defendant's attempt to "limit[] any liability that might somehow be assigned").  Defendant disagrees, arguing this sentence "merely limits the *maximum dollar amount* damages recoverable in the event damages are proven; it does not

---

[11]     The October Subcontract contains an identical limitation of liability provision.  Doc. 8-1 at 10 (Article 8).

[12]     The October Subcontract contains identical language limiting defendant's liability on termination.  Doc. 8-1 at 12 (§ 11.4).

vitiate the limitation on the *type* of damages that may be recovered . . . ." Doc. 11 at 5–6.

Neither party cites any law to support the contract interpretation advanced by the various

arguments.[13]

 "Under Missouri law, the interpretation of a contract is a question of law." *Union Elec.

Co. v. Chicago Bridge & Iron Co.*, 4:14 CV 31 RWS, 2015 WL 1262941, at *3 (E.D. Mo. Mar.

19, 2015); *see also Commerce Tr. Co. v. Howard*, 429 S.W.2d 702, 705–06 (Mo. 1968)

(explaining where language of a contract is clear and unambiguous, the construction of a contract

is a matter of law for the court to decide). "The terms of a contract are read as a whole to

determine the intention of the parties and are given their plain, ordinary, and usual meaning."

*Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003). And, "each

term of a contract is construed to avoid rendering other terms meaningless." *Id.* "A contract is

ambiguous only if its terms are susceptible to fair and honest differences." *Id.* It is "not

ambiguous merely because the parties disagree as to its construction." *Id.* "Where the language

of a contract is unambiguous, the intent of the parties is to be gathered from the contract alone

. . . ." *Id.* at 428–29. And, "'[w]hen a contract uses plain and unequivocal language, it must be

---

[13]  To support its argument for dismissal, defendant cites one Kansas case that held a clause limiting
consequential lost profits damages was enforceable and summary judgment was appropriate. Doc. 6 at 9
(citing *Wood River Pipeline Co. v. Willbros Energy Servs. Co.*, 738 P.2d 866, 872 (Kan. 1987)). In his
Response, plaintiff never disputes that limitation of liability for lost profits clauses are enforceable under
Kansas law.

  Missouri law similarly "allow[s] enforcement of limitation of liability clauses when such clauses
are not unconscionable or against public policy." *Saey v. Xerox Corp.*, 31 F. Supp. 2d 692, 701 (E.D. Mo.
1998); *see also Sports Capital Holdings (St. Louis), LLC v. Schindler Elevator Corp. & Kone, Inc.*, No.
4:12CV1108 SNLJ, 2014 WL 1400159, at *2 (E.D. Mo. 2014) ("It is well-settled in Missouri that
'[s]ophisticated parties have freedom of contract—even to make a bad bargain, or to relinquish
fundamental rights.' This freedom includes the right to contractually limit future remedies." (quoting
*Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc.*, 59 S.W.3d 505, 508 (Mo. 2001)) (further citations
omitted)); *World Enters., Inc.*, 713 S.W.2d at 610–11 (explaining "in contracts for services, consequential
damages may be contractually limited or excluded" and holding clause limiting liability was not
unconscionable or against public policy where contract was between two commercial entities who had
contracted with each other in a similar manner in the past and the provision was not unusual).

enforced as written."'  *Union Elec. Co.*, 2015 WL 1262941, at *3 (quoting *Deal v. Consumer Programs, Inc.*, 470 F.3d 1225, 1230 (8th Cir. 2006)).

The court thus must determine if the language in Article 8 clearly and unambiguously prohibits the lost profits damages plaintiff seeks or instead, if plaintiff has asserted a claim to recover *direct* lost profits damages that "'is plausible on its face.'" *Ashcroft*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  Article 8 of the December Subcontract explicitly states that defendant "shall not be liable . . . for loss of profits."  Doc. 1-1 at 17.  Plaintiff argues that the later sentence providing that defendant's liability for "direct damages shall not exceed the [purchase order] Price" means plaintiff is entitled to recover lost profits damages directly caused by defendant's breach.  But, to interpret Article 8 in this manner would render the contract's language prohibiting lost profits damages meaningless.  *See LDCircuit, LLC v. Sprint Commc'ns Co., L.P.*, 364 F. Supp. 2d 1246, 1256 (D. Kan. 2005) (interpreting similar limitation of liability provision and explaining the first sentence "is a limitation on the types of damages that the parties may recover—that is, they may not recover *any* special, indirect, incidental, exemplary, or consequential damages, or loss of profits from each other" but they could recover *other* types of damages, which were limited to the cap specified in the contract).[14]  The first sentence of Article 8 unambiguously states that the contract does not permit plaintiff to recover lost profits

---

[14]        The provision at issue in the *LDCircuit* case stated:

> **Liability of Parties.** IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES, OR LOSS OF PROFITS, ARISING FROM THE RELATIONSHIP OR THE CONDUCT OF BUSINESS UNDER THIS AGREEMENT.  LIABILITY OF SPRINT IN ANY AND ALL CATEGORIES, INCLUDING BUT NOT LIMITED TO MISTAKE, NEGLIGENCE, ACT OR OMISSION, INTENTIONAL ACTS, AND BREACH, SHALL NOT EXCEED IN THE AGGREGATE, ONE (1) MONTH'S AVERAGE COMMISSION PAID TO SALES AGENT.

364 F. Supp. 2d at 1255.

damages from defendant.  The second sentence "would be completely meaningless if it were interpreted to mean" that defendant's liability for loss of profits was limited to the purchase order price because the contract already proscribes liability for such damages.  *Id.*  The sentence limiting liability to the purchase order price addresses defendant's exposure for *other* types of direct damages, but does not permit recovery for loss of profits.  *See id.*; *cf. Catroppa v. Metal Bldg. Supply, Inc.*, 267 S.W.3d 812, 817–18 (Mo. Ct. App. 2008) (explaining a plaintiff asserting a breach of contract claim could seek actual, consequential, and/or benefit-of the bargain damages and "[t]here are situations in which all three types of damages could be deemed appropriate by a finder of fact, but that is not always the case").

This interpretation is consistent with other terms of the December Subcontract.  For example, under Section 11.4, if defendant terminates a purchase order it is obligated to pay subcontractor for the portion of work subcontractor completed, but not "for any anticipated profit on any portion of the Work not completed."  Doc. 1-1 at 18–19.  And, this provision continues, explaining the subcontractor also may receive a limited amount of "demobilization/remobilization costs and stand-by time" plus a negotiated amount for "rental amounts for equipment, fencing etc. that might be required to leave in place at a given Project Site."  *Id.* at 19.  Thus, the December Subcontract contemplates recovery of other types of direct damages, but limited by the limitation of liability damage cap if defendant failed to honor its obligations.

And, while plaintiff attempts to distinguish *direct* lost profits damages from the prohibition against lost profits in the first sentence of Article 8, the plain language of that provision cannot abide this distinction.  For example, where a limitation of liability provision includes lost profits damages in a list of *consequential* damages that are barred, a plaintiff still

may recover *direct* lost profits damages.  *See Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1155–57 (10th Cir. 2007) (interpreting contract under Kansas law that forbids recovery of consequential damages that "'include, but are not limited to lost profits'" and holding that language was unambiguous and barred only consequential lost profits but allowed direct lost profits damages); *Signature Mktg., Inc. v. New Frontier Armory, LLC*, No. 15-7200-JWL, 2016 WL 5409996, at *6–7 (D. Kan. Sept. 28, 2016) (denying defendant's summary judgment motion where plaintiff sought lost profits "as a result of the breach" where contract limited only "any punitive, indirect or consequential damages . . . including without limitation business interruptions, loss of profits, loss of revenues, loss of use of assets and loss of contracts"—*i.e.*, it precluded only recovery of consequential lost profits damages, but did not prohibit direct lost profits damages).

Here, the plain and unambiguous language of the December Subcontract limits defendant's liability for loss of profits generally, and not merely as a form of consequential damages.  The loss of profits exclusion is a separate category within the limitation of liability section.  And, Article 8 goes on to prohibit "any punitive, special, incidental, indirect, or consequential damages including, without limitation, governmental or regulatory sanctions." Doc. 1-1 at 17.  If the Subcontract had intended to include loss of profits as a subcategory of indirect or consequential damages, it would be meaningless to list it as a separate category.  *See Vaulting & Cash Servs., Inc. v. Diebold, Inc.*, No. 99-30294, 199 F.3d 440, 1999 WL 1068257, at *1–2 (5th Cir. Oct. 22, 1999) (applying Louisiana law and holding contract language that stated "in no event shall [defendant] be liable to [plaintiff] for indirect, incidental, consequential or similar damages, lost profits, [sic] lost business opportunities, whether arising under contract, tort, strict liability or other form of action" was unambiguous and barred all lost profits (direct or

indirect) because the "indirect, incidental, and consequential" language modified only the "damages" immediately following that phrase, not the remainder of the provision limiting liability); *CompuSpa, Inc. v. Int'l Bus. Machs. Corp.*, 228 F. Supp. 2d 613, 626–27 (D. Md. 2002) (applying New York law to defendant's motion to dismiss based on contract clause stating "in no event will either party be liable to the other in contract or tort or otherwise for any lost revenues, lost profits, incidental, indirect, consequential, special or punitive damages" and holding the limitation of liability clause was enforceable and plaintiff's claim for lost profits was barred); *Imaging Sys. Int'l, Inc. v. Magnetic Resonance Plus, Inc.*, 490 S.E.2d 124, 126–27 (Ga. Ct. App. 1997) (reversing trial court's damage award and holding contract provision stating neither party "will be liable . . . for any lost profits or any incidental, special, or consequential damages relating this agreement" explicitly "prohibited the recovery of 'any lost profits'" whether direct or indirect, and thus no lost profits damages were recoverable under the contract); *cf. Saey v. Xerox Corp.*, 31 F. Supp. 2d 692, 701–02 (E.D. Mo. 1998) (interpreting clause limiting liability for "'lost profits or *other* incidental . . . damages'" to mean "the parties intended lost profits to be interpreted as incidental damages" and holding on summary judgment that plaintiff could not recover damages for lost profits or other incidental damages, but plaintiff could recover lost commissions as direct damages (emphasis added)); *Corelink v. Phygen, LLC*, No. 4:13-CV-1842 (CEJ), 2014 WL 7140442, at *4 (E.D. Mo. Dec. 12, 2014) (holding contract did not limit lost profits for breach of contract where provision explicitly addressed liability for defects in the product, but not liability for other claims); *Union Elec. Co. v. Chicago Bridge & Iron Co.*, No. 4:14 CV 31 RWS, 2015 WL 2193809, at *2–3 (E.D. Mo. May 11, 2015) (distinguishing direct damages claim from contract's provision limiting liability only for consequential damages).

In sum, the plain language of the December Subcontract unambiguously limits defendant's liability and prohibits lost profits damages.  Even assuming all facts alleged in the Petition are true, plaintiff has failed to state a plausible claim for relief.  Plaintiff alleges damages "in an amount not less than $182,000.00"—what his "net profit . . . would have totaled" had defendant not terminated the projects.  Doc. 1-1 at 7.  But, the language of the contract is clear and unambiguous.  It bars plaintiff from recovering lost profits damages under Article 8's limitation of liability provision.  The court thus grants defendant's motion to dismiss plaintiff's breach of contract claim because plaintiff has not stated a plausible claim for relief under the final element of a breach of contract claim—damages sustained by the plaintiff.  *See Accessdata Corp. v. Alste Techs. GmbH*, No. 2:08 CV 569(TC), 2009 WL 3248126, at *5–6 (D. Utah Oct. 7, 2009) (dismissing breach of contract claim where counter-claimant failed to allege cognizable damages because plain language of contract precluded lost profits theory of damages).

### III.    Conclusion

The court concludes defendant has provided evidence sufficient to carry its preponderance of evidence burden to establish its principal place of business is North Carolina, not in Kansas.  This conclusion means that defendant's removal notice properly invoked diversity jurisdiction.  The court thus denies plaintiff's motion to remand the case to state court.  The court also concludes plaintiff has failed to plead the existence of a contract for the Grand Hotel Tesla Project and has failed to state a plausible claim for damages.  Plaintiff alleges lost profits damages for defendant's alleged failure to notify plaintiff about the cancellation of any of the projects, but the parties' contract explicitly forbids this type of damages.  The court thus grants defendant's motion to dismiss plaintiff's breach of contract claim under Rule 12(b)(6).

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff Richard (John) Davis doing business as Davis Electric's Motion to Remand to Kansas State Court and for Attorney Fees (Doc. 7) is denied.

**IT IS FURTHER ORDERED THAT** defendant Overland Contracting, Inc.'s Motion to Dismiss (Doc. 5) is granted.  The court directs the Clerk to enter a judgment consistent with this holding.

**IT IS SO ORDERED.**

**Dated this 24th day of April, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree_____**
**Daniel D. Crabtree**
**United States District Judge**
